

**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

June 4, 2019

Geoffrey E. Hobart, Esq.
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956

    Re:    *United States v. Insys Pharma, Inc.*

Dear Mr. Hobart:

    The United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Insys Pharma, Inc. (hereinafter, "Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

    1.    <u>Plea</u>

    No later than June 7, 2019, Defendant shall waive indictment and plead guilty to the Information attached to this Plea Agreement, charging it with five counts of mail fraud, in violation of 18 U.S.C. § 1341. Defendant expressly and unequivocally admits that it committed the crimes charged in the Information, did so knowingly and willfully, and is in fact guilty of those offenses.

    Defendant agrees to the accuracy of the Statement of Facts attached as Exhibit A.

    2.    <u>Penalties</u>

Defendant faces the following maximum penalties:

    a.    A fine of $500,000, or twice the gross gain or loss, whichever is greater, pursuant to 18 U.S.C. § 3571(c), (d).

1

b. A term of probation of not less than one (1) year and not more than five (5) years, pursuant to 18 U.S.C. § 3561(c)(1);

c. A mandatory special assessment of $500, pursuant to 18 U.S.C. 3013(a)(2);

d. Restitution to any victims of the offense if authorized by law; and

e. Forfeiture to the extent charged in the Information.

3. <u>Sentencing Guidelines</u>

The parties agree jointly to take the following positions at sentencing under the United States Sentencing Guidelines ("USSG" or "Guidelines"). The parties agree that Defendant's total adjusted offense level under the Guidelines is calculated as follows:

- The parties agree that in accordance with USSG § 8C2.2(b), no precise determination of the guideline fine range is required because it is readily ascertainable that Defendant cannot and is not likely to become able to pay the minimum of the guideline fine range. The parties agree that the minimum of the guideline fine range is calculated as follows.

- The parties agree that in accordance with USSG § 8C2.4, Defendant's base fine is more than $250,000,000 and less than $550,000,000, based on the pecuniary gain to Defendant.

- The parties agree that pursuant to USSG § 8C2.5, Defendant's culpability score is 6, determined as follows:

  o in accordance with USSG § 8C2.5(a), Defendant's base culpability score is 5;

  o in accordance with USSG § 8C2.5(b)(3)(A)(i), Defendant's culpability score is increased by 3, because Defendant had 200 or more employees and an individual within high-level personnel of Defendant participated in and condoned the conduct;

  o in accordance with USSG § 8C2.5(g), because Defendant demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct, Defendant's culpability score is reduced by 2;

- Disgorgement pursuant to USSG § 8C2.9 is not necessary.

The U.S. Attorney and Defendant agree that under USSG § 8C3.3(b) there is a basis for a reduction in the fine recommended by USSG §8C2.7 because, based on a review of Defendant's

2

financial data, the parties agree that Defendant is not able to pay and, even with the use of a reasonable installment schedule, is not likely to become able to pay the minimum advisory Guidelines fine. As a result, the parties agree that a fine below the advisory Guidelines fine range will result in a reasonable sentence, taking into consideration all of the factors set forth in 18 U.S.C. §§ 3553(a) and 3572.

Defendant understands that the Court is not required to follow this calculation, and that Defendant may not withdraw its guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

The U.S. Attorney may, at his sole option, be released from his commitments under this Plea Agreement if at any time between Defendant's execution of this Plea Agreement and sentencing, Defendant:

- (a) Fails to admit a complete factual basis for the plea;

- (b) Fails to truthfully admit Defendant's conduct in the offense of conviction;

- (c) Falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under USSG § 1B1.3;

- (d) Fails to provide truthful information about Defendant's financial status;

- (e) Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Defendant is accountable under USSG § 1B1.3;

- (f) Engages in acts that form a basis for finding that Defendant has obstructed or impeded the administration of justice under USSG § 3C1.1;

- (g) Intentionally fails to appear in Court or violates any condition of release;

- (h) Commits a crime; or

- (i) Attempts to withdraw Defendant's guilty plea.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4. Sentence Recommendation

The U.S. Attorney and Defendant agree to recommend the following sentence to the Court:

- (a) A criminal fine in the amount of $2,000,000, to be paid within 10 business days of the date of sentencing;

- (b) A mandatory special assessment of $500, which Defendant must pay to the

Clerk of the Court on or before the date of sentencing;

(e) Forfeiture in the amount of $28,000,000, $3,000,000 of which will be paid within 10 days of the date of sentencing. The remainder of the forfeiture will be paid under the terms and conditions set forth in Paragraph 8;

(f) With respect to restitution to victims, the United States will file a motion, pursuant to 18 U.S.C. § 3771(d)(2), requesting authorization to notify potential victims through the issuance of a press release, and publication on its website. The United States will assess any submissions provided by potential victims and will make a recommendation to the Court regarding potential restitution.

5. No Further Prosecution of Insys Pharma, Inc.

Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the United States agrees that, other than the charges in the attached Information, it shall not further prosecute Defendant for any additional federal criminal charges with respect to the conduct: (a) covered by the Information; (b) that was the subject of the criminal investigation in the District of Massachusetts; or (c) currently known to the United States regarding sales, promotion and marketing practices of Defendant.

This declination is expressly contingent on: (i) the guilty plea of Defendant to the attached Information being accepted by the Court and not withdrawn or otherwise challenged; and (ii) Defendant's performance of all of its obligations, including without limitation its cooperation obligations, as set forth in this Plea Agreement. If Defendant's guilty plea is not accepted by the Court or is withdrawn for any reason, or if Defendant should fail to perform any obligation under this Plea Agreement, this declination of prosecution shall be null and void.

The United States reserves the right to prosecute any individual, including but not limited to present and former owners, officers, employees, managers, and agents of Defendant in connection with the conduct encompassed by this Plea Agreement, within the scope of the criminal investigation in the District of Massachusetts, or known to the United States regarding sales, promotion and marketing practices of Defendant.

6. Waiver of Appellate Rights and Challenges to Conviction or Sentence

Defendant has the right to challenge its conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that its conviction or sentence should be overturned.

Defendant understands that it has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

4

a) It will not challenge its <u>conviction</u> on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

b) If the Court's sentence follows the agreed sentence recommendation of the U.S. Attorney and Defendant described in Paragraph 4, Defendant will not challenge its <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit; Defendant expressly reserves its right to appeal or challenge the Court's sentence if the Court does not follow the agreed sentence recommendation of the U.S. Attorney and Defendant described in Paragraph 4.

Defendant understands that, by agreeing to the above, its conviction and sentence will be final if the Court issues a written judgment after the sentencing hearing that adopts the joint sentencing recommendation of the parties as set forth in Paragraph 4 above. <u>That is, if the Court adopts the joint sentencing recommendation of the parties described in Paragraph 4 above, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge its conviction and sentence regardless of whether it later changes its mind or finds new information that would have led it not to agree to give up these rights in the first place.</u>

Defendant acknowledges that it is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that its lawyer rendered ineffective assistance of counsel, or that the prosecutor engaged in misconduct serious enough to entitle Defendant to have its conviction or sentence overturned.

7. <u>Waiver of Hyde Amendment Claim</u>

Defendant is aware that 111 Stat. 2440, 2520 (1997), the so-called "Hyde Amendment," authorizes courts in criminal cases to award to certain prevailing defendants attorneys' fees and other litigation expenses. In exchange for concessions the U.S. Attorney made in this Plea Agreement, Defendant voluntarily and knowingly waives any claim Defendant might assert under this statute based in whole or in part on the U.S. Attorney's agreement in Paragraph 1.

8. <u>Forfeiture</u>

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

a. $28,000,000 (Twenty-Eight Million Dollars) in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $28,000,000 is subject to forfeiture on the grounds that it is at least equal to the amount of proceeds Defendant derived from the offenses.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly) as a result of the crime to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, placed beyond the jurisdiction of the Court, substantially diminished in value, commingled with other property which cannot be divided without difficulty, or cannot be located upon exercise of due diligence. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to make payments pursuant to the following schedule:

- $3 million, plus interest, shall be due within ten days of sentencing.
- $5 million, plus interest, shall be due one year after the sentencing date.
- $5 million, plus interest, shall be due two years after the sentencing date.
- $5 million, plus interest, shall be due three years after the sentencing date.
- $5 million, plus interest, shall be due four years after the sentencing date.
- $5 million, plus interest, shall be due five years after the sentencing date.

In the event Defendant makes these timely payments to satisfy the $28,000,000 obligation, the United States agrees not to otherwise seek forfeiture from Defendant of substitute assets to satisfy this obligation.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement, including any subsequent amendment pursuant to Fed. R. Crim. P. 32.2.

In the event the Court enters a Restitution Order, the United States agrees that it shall seek permission from the Attorney General, via his designee, the Money Laundering and Asset Recovery Section, to apply forfeited funds to the restitution obligation.

Defendant agrees to provide all information requested by the U.S. Probation Office concerning Defendant's assets.

9. <u>Civil Liability</u>

By entering into this Plea Agreement, the U.S. Attorney does not compromise any civil liability, including but not limited to any tax liability, Defendant may have incurred or may incur as a result of Defendant's conduct and plea of guilty to the charges specified in Paragraph 1 of this Plea Agreement.

10. <u>Withdrawal of Plea by Defendant or Rejection of Plea by Court</u>

Should Defendant move to withdraw its guilty plea at any time, or should the Court reject the parties' agreed-upon disposition of the case or any other aspect of this Plea Agreement, this Plea Agreement shall be null and void at the option of the U.S. Attorney. In this event, Defendant agrees to waive any defenses based upon the statute of limitations, the constitutional protection against pre-indictment delay, and the Speedy Trial Act with respect to any and all charges that could have been timely brought or pursued as of the date of this Plea Agreement.

11. <u>Breach of Plea Agreement</u>

If the U.S. Attorney determines that Defendant has failed to comply with any provision of this Plea Agreement, has engaged in any of the activities set forth in Paragraph 3(a)-(i) or has committed any crime following Defendant's execution of this Plea Agreement, the U.S. Attorney may, at his sole option, be released from his commitments under this Plea Agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The U.S. Attorney may also pursue all remedies available to him under the law, regardless whether he elects to be released from his commitments under this Plea Agreement. Further, the U.S. Attorney may pursue any and all charges which otherwise may have been brought against Defendant and/or have been, or are to be, dismissed pursuant to this Plea Agreement. Defendant recognizes that its breach of any obligation under this Plea Agreement shall not give rise to grounds for withdrawal of Defendant's guilty plea, but will give the U.S. Attorney the right to use against Defendant before any grand jury, at any trial or hearing, or for sentencing purposes, any statements made by Defendant and any information, materials, documents or objects provided by Defendant to the government, without any limitation, regardless of any prior agreements or understandings, written or oral, to the contrary. In this regard, Defendant hereby waives any defense to any charges that Defendant might otherwise have based upon any statute of limitations, the constitutional protection against pre-indictment delay, or the Speedy Trial Act.

12. <u>Who is Bound by Plea Agreement</u>

This Plea Agreement is binding upon Defendant and the Office of the United States Attorney for the District of Massachusetts, the United States Attorney's Office for each of the other 92 judicial districts of the United States, and the United States Department of Justice. Defendant understands that this Plea Agreement does not bind any state or local prosecutive authorities, the Tax Division of the U.S. Department of Justice, or the Internal Revenue Service of the U.S. Department of the Treasury.

13. <u>Modifications to Plea Agreement</u>

This Plea Agreement and the attachments hereto set forth the complete and only agreement between the parties relating to the disposition of the Information described in Paragraph 1. No promises, representations, or agreements have been made other than those set forth in this Plea Agreement and its attachments. This Plea Agreement supersedes prior understandings, if any, of the parties, whether written or oral. This Plea Agreement, and its attachments hereto, can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Amanda P.M. Strachan.

        Very truly yours,

        ANDREW E. LELLING
        United States Attorney

By: *[signature]*
        ZACHARY R. HAFER
        Chief, Criminal Division
        KARIN E. BELL
        Deputy Chief, Criminal Division

*[signature]*
AMANDA P.M. STRACHAN
K. NATHANIEL YEAGER
SUSAN M. POSWISTILO
Assistant U.S. Attorneys
John Joseph Moakley Federal Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Acknowledgment on behalf of Insys Pharma, Inc.

I, Andrece Housley, Chief Financial Officer, the duly authorized representative of Insys Pharma, Inc., hereby expressly acknowledge the following: (1) that I have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Statement of Facts; (2) that I have had an opportunity to discuss this Agreement fully and freely with counsel, Covington & Burling LLP; (3) that Insys Pharma, Inc. fully and completely understands each and every one of the terms of this Agreement; (4) that Insys Pharma, Inc. is fully satisfied with the advice and representation provided to it by its counsel, Covington & Burling LLP; (5) that I am authorized, on behalf of Insys Pharma, Inc., to enter into this Agreement; and (6) that Insys Pharma, Inc. has signed this Agreement knowingly and voluntarily.

Insys Pharma, Inc.

6/5/19
DATE

Andrece Housley
Chief Financial Officer
Insys Therapeutics, Inc.

Acknowledgment BY COUNSEL OF Insys Pharma, Inc.

    I, Geoffrey E. Hobart, the attorney representing Insys Pharma, Inc., hereby expressly acknowledge the following: (1) that I have reviewed and discussed this Agreement with my client; (2) that I have explained fully each one of the terms of the Agreement to my client; (3) that I have answered fully each and every question put to me by my client regarding the Agreement; and (4) that I believe my client fully and completely understands all of the Agreement's terms.

6/4/2019
DATE

Geoffrey E. Hobart / MFD
Covington & Burling LLP

# STATEMENT OF FACTS FOR INSYS THERAPEUTICS, INC. DEFERRED PROSECUTION AGREEMENT AND INSYS PHARMA, INC. PLEA AGREEMENT

Defendant, Insys Therapeutics, Inc., its agents and subsidiaries, (collectively "Insys") hereby agrees and stipulates that at all times relevant to the Information pending against it in the United States District Court for the District of Massachusetts, in *United States v. Insys Therapeutics, Inc.*, et al., Criminal No. 19-cr-10191-RWZ, the following is true and accurate:

1. Insys is a Delaware corporation that maintains a principal place of business in Chandler, Arizona. At all times relevant to the Information, Insys Pharma, Inc. was a wholly owned subsidiary of Insys Therapeutics, Inc. and was its main operating subsidiary.

2. Insys developed and owns a drug called SUBSYS® (hereinafter "Subsys"), a spray formulation of fentanyl to be applied under a patient's tongue (also called a sublingual spray). The United States Food and Drug Administration ("FDA") approved Subsys in or about January 2012 for the management of breakthrough pain in patients 18 years of age or older with cancer who are already receiving and who are already tolerant to opioid therapy for their underlying persistent cancer pain. Subsys is in a category of drugs called Transmucosal Immediate Release Fentanyl ("TIRF") products, which includes other fentanyl-based rapid onset opioids that competed with Subsys.

3. From in or about March 2012 to the present, Insys marketed and sold Subsys in interstate commerce, including in the District of Massachusetts.

4. Subsys could only be prescribed by a licensed medical practitioner who was registered with the DEA and able to prescribe opioids in the usual course of professional practice for a legitimate medical purpose.

5.  Market demand for Subsys was driven in large part by the practitioners who wrote prescriptions for their patients. Practitioners willing to write prescriptions for Subsys had a number of competing medications from which to choose. In addition to other brand name TIRF drugs, practitioners could also prescribe a generic TIRF medicine.

6.  Depending on the dosage and number of units prescribed, a prescription for Subsys often cost thousands of dollars each month. Most patients relied on commercial insurance and/or publicly funded insurance, including Medicare and Medicaid, to subsidize the cost of taking Subsys.

7.  Insys knew that insurers would not authorize payment for Subsys if the prescription was written in exchange for a bribe, or kickback, and was not medically necessary. In general, patients had to have a specific medical diagnosis before the insurer, including Medicare, would authorize payment for Subsys. Many insurers would not pay for Subsys until the patient had tried and failed certain other preferred medications.

8.  Beginning in August 2012 and continuing until June 2015, Insys paid bribes to certain practitioners as part of a scheme to defraud patients and insurers, including Medicare. Insys paid the bribes in order to induce certain practitioners to write unnecessary Subsys prescriptions.

9.  Specifically, Insys used pharmacy data acquired from third parties to identify practitioners who either prescribed high volumes of rapid-onset opioids or who had demonstrated a capacity to prescribe large volumes of rapid-onset opioids.

10. Insys paid bribes to certain practitioners to prescribe Subsys through its Speaker Program. The Speaker Program was a marketing program that purported to increase brand awareness of Subsys by sponsoring peer-to-peer educational lunches and dinners. Purportedly in

exchange for a practitioner educating other prescribers about Subsys, Insys agreed to pay the speaker a fee, also referred to as an "honoraria," for each speaking event.

11. The Speaker Program included certain speaker practitioners who had the potential to prescribe Subsys, and was used to induce them to write more, medically unnecessary prescriptions in exchange for payment of money by Insys in the form of honoraria. Insys fashioned the payments to these certain practitioners as speaker fees, or honoraria, in order to hide the fact that they were in fact bribes paid to induce certain practitioners to write Subsys prescriptions.

12. Rather than educational gatherings, Speaker Program events often did not involve any education or presentations about the drug. Frequently, Speaker Program events did not have attendees who were licensed to prescribe Subsys, but rather included support staff employed by the speaker. Many speaker events had no attendees at all. When this occurred, Insys's sales representatives were directed by management to falsify the names of attendees and their signatures on sign-in sheets. Sham Speaker Program events occurred at restaurants within the District of Massachusetts and elsewhere, and functioned as bribes in the form of free dinners for speakers, friends, and, at times, family, and served as a vehicle to pay a bribe to the speaker in the disguised form of an honoraria.

13. In a number of instances, high-level officers, directors, executives, managers, and the executive chairman of Insys's Board of Directors expressly required a practitioner to write a minimum number of Subsys prescriptions, write prescriptions at a minimum dosage, and write prescriptions for a minimum number of units of Subsys, in order for the speaker to continue receiving the bribe, that is, the so-called honoraria, for sham events. For all speakers during certain periods, Insys tracked its so-called return on investment: it measured the effect of the payments, which functioned as bribes to certain practitioners, on the speaker's prescribing habits, and,

correspondingly, the effect of the bribes on the revenue that each bribed speaker generated for it. If a speaker failed to meet the minimum prescription and return on investment requirements, Insys took Speaker Program payments away from practitioners, or reduced the total amount of Speaker Program payments paid to practitioners, unless and until the practitioner wrote a satisfactory number of new prescriptions, or raised the dosage and volume of existing Subsys prescriptions. Each new prescription, refill, or existing prescription written for a higher dose of Subsys generated greater income to Insys.

14. Insys agreed with certain practitioners, including but not limited to certain practitioners in New Hampshire and Illinois, to conduct Speaker Programs, which were solely a mechanism to pay bribes to these practitioners for prescribing Subsys.

15. One such practitioner targeted by Insys and to whom Insys, through certain employees, offered bribes was a physician's assistant ("P.A.") who practiced with a pain clinic based in Somersworth, New Hampshire.

16. During the first year that Subsys was on the market, the P.A. did not write any Subsys prescriptions. In or about April 2013, a sales representative working on behalf of Insys catered a lunch at the P.A.'s pain clinic. In or about June 2013, the P.A. wrote his first prescription for Subsys. The sales representative encouraged the P.A. to submit his resume for consideration in the Insys Speaker Program, which the P.A. did on the same day.

17. Approximately one month later, Insys approved the P.A. as a speaker on the recommendation of Insys's then Vice President of Sales.

18. The P.A. and Insys's sales representative frequently discussed new patients for whom the P.A. could prescribe Subsys.

4

19. On or about November 14, 2013, the sales representative arranged a Speaker Program event at a restaurant in Portsmouth, New Hampshire at which the P.A. was the purported Subsys speaker. No other medical practitioners who could prescribe Subsys were present at the dinner, and the P.A. did not make a presentation about the drug. The signature of physician's assistant S.T. was forged on a sign-in sheet to make it appear S.T. was present at the dinner when he was not.

20. On or about November 21, 2013, Insys issued check number 801 to the P.A. in the amount of $1,200 as payment in part for the November 14, 2013 Speaker Program event.

21. On or about November 19, 2013, the sales representative arranged a Speaker Program event at a second restaurant in Portsmouth, New Hampshire at which the P.A. was the purported Subsys speaker. No other practitioners who could prescribe Subsys were present at the dinner, and the P.A. did not make a presentation about the drug. The signature of nurse practitioner K.T. was forged on a sign-in sheet to make it appear K.T. was present at the dinner when she was not.

22. On or about November 25, 2013, Insys issued check number 935 to the P.A. in the amount of $2,000 as payment in part for the November 19, 2013 Speaker Program event.

23. On or about January 13, 2014, the sales representative arranged a Speaker Program event at a restaurant in Boston, Massachusetts at which the P.A. purportedly spoke about Subsys. No other medical practitioners who could prescribe Subsys were present at the dinner, and the P.A. did not make a presentation about the drug. The signatures of physician's assistant L.C. and medical assistant P.M. were forged on a sign-in sheet to make it appear they were present at the dinner when they were not.

24. Insys issued check number 1550 to the P.A. in the amount of $1,000 as payment in part for the January 13, 2014 Speaker Program event.

25. On March 11, 2014, Insys arranged a Speaker Program event at a second restaurant in Boston, Massachusetts at which the P.A. was the purported speaker. No other medical professionals who could prescribe Subsys were present, and the P.A. did not make a presentation about the drug. The only attendees at the dinner were the P.A., a relative of the P.A., and Insys's sales representative. The signature of physician's assistant L.C. was forged on a sign-in sheet to make it appear she was present at the dinner when she was not.

26. On or about March 20, 2014, Insys issued check number 2408 to the P.A. in the amount of $2,000 as payment in part for the March 11, 2014 Speaker Program event.

27. On July 28, 2014, Insys arranged a Speaker Program event at a third restaurant in Portsmouth, New Hampshire at which the P.A. was the purported speaker. No other medical practitioners who could prescribe Subsys were present at the dinner, and the P.A. did not make a presentation about the drug. The signatures of S.M. and T.C. were forged on a sign-in-sheet to make it appear they were present at the dinner when they were not.

28. On or about August 4, 2014, Insys's agent, on behalf of Insys, issued check number 25662 to the P.A. in the amount of $1,000 as payment in part for the July 28, 2014 Speaker Program event.

29. Between August 2013 and October 2014, Insys's employees invited the P.A. to approximately 44 Speaker Program events at various restaurants and other locations. For each of the events, the P.A. was paid a fee of between $500 and $2,000. Insys paid the P.A. approximately $44,000 for purportedly speaking about Subsys at Speaker Program events when, in fact, he had

not. Instead, they were bribes paid by Insys to the P.A. for the purpose of inducing the P.A. to write medically unnecessary Subsys prescriptions.

30. Had the insurers known that Insys paid bribes to the P.A. that caused the P.A. to write medically unnecessary Subsys prescriptions, the insurers would not have authorized payment for those prescriptions.

31. Insys caused each of the bribes in the form of the above-described honoraria checks to be sent and delivered in interstate commerce by the United States Postal Service and by private and commercial interstate carriers.

32. The payments made by Insys to the P.A. for sham Speaker Program events, as described in this Statement of Facts, violated Title 18, United States Code, Section 1341.

33. Insys agreed with and paid certain other practitioners, including a practitioner in Illinois, to conduct sham Speaker Program events that were solely to induce this practitioner and certain others to prescribe Subsys, in violation of Title 18, United States Code, Section 1341.

34. Insys's net revenues were approximately $95.8 million in 2013 due to sales of Subsys. That amount rose to approximately $219.5 million in 2014.